IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| WELLS FARGO BANK, N.A., ) <br> AS TRUSTEE OF THE JOE ) <br> DICESARE 2008 IRREVOCABLE ) <br> LIFE INSURANCE TRUST I AND ) <br> AS TRUSTEE OF THE JOE ) <br> DICESARE 2008 IRREVOCABLE ) <br> LIFE INSURANCE TRUST II, ) <br> Plaintiff, ) <br> ) <br> v. ) <br> ) <br> THE LINCOLN NATIONAL LIFE ) <br> INSURANCE COMPANY, a ) <br> foreign insurance corporation, ) <br> Defendant. ) | CASE NO.  10CV-703 TCK TLW |
| MIDAS LIFE SETTLEMENTS, LLC, ) <br> a Delaware limited liability company, ) <br> ) <br>    Third-Party Plaintiff-Intervenor, ) <br> ) <br> v. ) <br> ) <br> WELLS FARGO BANK, N.A., ) <br> AS TRUSTEE OF THE JOE ) <br> DICESARE 2008 IRREVOCABLE ) <br> LIFE INSURANCE TRUST I AND ) <br> AS TRUSTEE OF THE JOE ) <br> DICESARE 2008 IRREVOCABLE ) <br> LIFE INSURANCE TRUST II, and ) <br> THE LINCOLN NATIONAL LIFE ) <br> INSURANCE COMPANY, a ) <br> foreign insurance corporation, ) <br> ) <br> Third-Party Defendants. ) | |

**PLAINTIFF'S RESPONSE TO DEFENDANT'S MOTION IN LIMINE
CONCERNING ISSUES RELATED TO UNDERWRITING AND CLAIMS REVIEW**

      Through its Motion in Limine, Defendant seeks to prevent the jury from learning of

significant evidence - evidence surrounding and placing in context the actions of its underwriter prior

to issuance of the policies on Joe Dicesare's life, as well as the actions of its employees which led to the denial of policy benefits to Dicesare's survivors. The information addressed in Defendant's motion is probative of core issues involved in this case, and Plaintiff would be severely and improperly prejudiced by its exclusion.

Relevant evidence, meaning evidence which has <u>any</u> tendency to make the existence of any fact of consequence more or less probable, is admissible, barring the likelihood of *unfair* prejudice, confusion of the issues, or misleading the jury (Rules 401, 402, 403 of Federal Rules of Evidence).

A broad view of admissibility is appropriate at the pre-trial stage. Unless it is clear, even outside all likely contexts in which the evidence could be offered at trial, that the matters in question would clearly violate the Rules of Evidence, or unquestionably result in unfair prejudice, the Court should prudently withhold judgment and make rulings of admissibility at the time the evidence is presented.

As will be shown more fully herein, the information which Defendant seeks to prevent the jury from receiving is clearly probative of facts of great consequence, and not improperly prejudicial to Defendant's right to a fair trial.

## ARGUMENTS AND AUTHORITIES

1. **"No duty to investigate at the underwriting stage"**

In *Adriaenssens v. Allstate Ins. Co.*, 258 F.2d 888 (10th Cir. Okla. 1958), the Tenth Circuit recognized that under Oklahoma law, a duty to investigate is created when notice of a fact or facts indicates possible misrepresentation. In those circumstances, the Court held, an insurer is required under peril of estoppel to make inquiry so as to throw light upon the truth or falsity of the representations in the application. *Id.* at 891.

The Court further stated in *Adriaenssens* that "it is essential to the appropriate application of the doctrine of equitable estoppel that the party against whom the plea is directed acted or failed to act with knowledge of the facts, or that he was in such position that he should have known them." *Id.* at 891.

In *Vaughn v. American Nat. Ins. Co.*, 1975 OK 169, the Supreme Court of Oklahoma reversed the <u>factual</u> conclusion reached by the Court of Appeals, but adopted the legal rationale underlying it, which was that:

> "The words 'actual notice' do not always mean in law what in metaphysical strictness they import. They more often mean knowledge of facts and circumstances sufficiently pertinent in character to enable reasonably cautious and prudent persons to investigate and ascertain as to the ultimate facts." Id. at ¶5.

The Supreme Court arrived at the conclusion that under the particular set of facts before them, the insurer was not sufficiently alerted to the need to conduct inquiry into the truth of representations on the application, having been "lulled into complacency" by the applications. The factual conclusion reached in that case provides no support for Defendant's contention that no such duty ever exists under any circumstances. In fact, the language in *Vaughn* supports the opposite legal conclusion. Were Defendant's argument correct, there would be no purpose for the entire passage regarding alerts and being lulled into complacency to be included by the Court in its opinion. It is only because the law does impose the duty on insurers to investigate representations under appropriate circumstances that the Court's language in this regard has any meaning.

In *Claborn v. Washington Nat. Ins. Co.*, 1996 OK 8, the Supreme Court of Oklahoma used language similar to that found in *Vaughn*, saying that "(T)here was nothing in the application that would have alerted Washington National to Mr. Claborn's past seizure episodes as well as his

3

treatment for alcoholism." Id, at ¶12.  Once again, unless the result would have been different had something been found in the application to have alerted the insurer, this entire line of comment has no place in the opinion, as it would be completely irrelevant to the outcome.

Oklahoma's statute on material misrepresentation, Tit. 36 O.S. §3609, was addressed in *Coppin v. Shelter Mut. Ins. Co.*, 1987 OK CIV APP 58.  Therein, the Court of Appeals stated that an insurer cannot escape liability if, among other reasons, "there was no reliance - the insurer <u>knew or should have known</u> the true facts before it issued the policy." Id. at ¶17.  This "knew or should have known" language recognizes that insurers are held responsible to inquire further into facts behind an applicant's representations when facts point to the need to do so.

Under Oklahoma law, an insurer faced with facts or circumstances which bring the accuracy or truth of material representations on an application into question bears the duty to perform a reasonable inquiry into those representations, upon peril of being estopped from asserting as a defense to the policy any facts which such inquiry would have revealed.  This is general insurance law, and it is the law of Oklahoma, as well.  Evidence of this duty, in light of the multiple red flag warnings of misrepresentation and inaccuracy observed by Lincoln prior to issuance is highly relevant and should be permitted.

2.  **"Industry standards generally" and "Lincoln's compliance with its underwriting guidelines"**

Knowledge of the standards and guidelines of both Lincoln and the industry in general are important facts for jurors to know in their assessment of whether Lincoln did or did not have knowledge of facts, whether Lincoln should have known of the facts, and whether Lincoln did or did not actually act in a manner consistent with an insurer who knew, whether actually or constructively,

of the truth of the representations made on the applications.

In the absence of evidence establishing the proper actions for an insurer possessing such information, jurors will be at a loss to determine whether Defendant's actions upon recognition of red flags was or was not appropriate - in other words, whether Defendant's defense of material misrepresentation is supported by the facts. Defendant seeks to have jurors consider the minimum number of facts, and to consider them in a vacuum, devoid of any context.

Were Defendant's position to prevail, jurors would face difficulty in grasping the significance of the many, many inconsistencies observed by Lincoln's underwriter during his (virtually meaningless) review of financial representations. In the absence of evidence of proper practices recognized by both Lincoln and the industry at large, jurors may feel they have no basis upon which to determine whether issuance of the policies was the appropriate action to be taken, given the information possessed by the underwriter.

Additionally, evidence of Lincoln's guidelines and industry underwriting standards is necessary for any assessment of Defendant's post-claim review of its underwriting and determination of materiality. Knowledge of these standards and guidelines is needed to assess whether Lincoln's claims reviewers, Cham Edmiston in particular, should have recognized that, had the standards and guidelines been followed, the policies would not have been issued. If Edmiston knew or should have known that policies were issued in violation of these guidelines, the appropriateness of his determination of the materiality of the information is seriously in doubt, which in turn, affects the jurors' evaluation of Plaintiff's bad faith action.

Michael Janulewicz testified that "information not consistent with our general underwriting guidelines" constitutes a red flag (Janulewicz Deposition, attached hereto as Exhibit A, p.26). Jurors

5

may properly consider whether red flags known to Defendant created either actual or constructive notice of possible misrepresentation of financial information on the applications. This evidence is necessary for determining the existence or absence of materiality and reliance, and whether any alleged reliance was reasonable under the circumstances.

It is reasonable to presume that none of the jurors sitting in judgment of this case will have any experience in underwriting life insurance policies. Information should be available to them which provides direction as to what is and is not the proper action for an insurer to take in the face of numerous recognized red flags.

Information concerning Joe Dicesare's liquid assets and Lincoln's internal guidelines concerning that information is highly relevant. Defendant's guidelines require an applicant to have sufficient liquid assets to satisfy the premium loan balance in order to prevent the policy from lapsing (Ex. A, p.106). Janulewicz admitted that Dicesare's information did not reflect the existence of liquid assets sufficient to cover the loan balance (Ex. A, p.202). He admitted this was a red flag (Ex. A, pp.106-107). This evidence of the ignoring of a known and admitted red flag is probative on the issue of reliance - did Defendant actually rely on the financial representations if it was willing to issue coverage with no further information concerning liquid assets other than that which showed them to be inadequate? It also raises the question of whether Janulewicz even read the financial information available to him before approving issuance, which is, likewise, probative on the critical element of reliance. Without evidence of Lincoln's internal guidelines regarding liquid assets to provide context, this crucial information becomes virtually meaningless.

Additionally, the Exit Strategy concerning Dicesare's liquid assets was part of the Financial Underwriting Worksheet. The Court will recall that it is this document alone, signed by Mark

Galloway, that Defendant contends served to wipe away any concerns created by the multiple red flags Janulewicz saw. The information on the worksheet regarding liquid assets ("Mr. Dicesare feels he has adequate liquis (sic) assets to satisfy the approximately $7.8 million loan balance") is directly in conflict with what Janulewicz found in his analysis of the submission - <u>inadequate</u> assets to cover that balance (Ex.A, p.203). He specifically identified this inconsistency as a red flag (Ex. A, p.202).

Much the same is true with regard to the income-to-premium ratio, also identified by Janulewicz as a red flag (Ex. A, p.200). He stated that the company's general guideline is that annual premium should not exceed 40% of an applicant's annual income, although in rare, specially justified cases, it can exceed 75% or, on very rare instances, even 100% (Ex. A, pp.103-104). The multiple figures Lincoln possessed for Dicesare's annual income ranged from $263,000 to $558,000. The premiums on the policies for the first two years of coverage was $999,000 <u>for each policy</u>, creating a total initial premium of $1,999,998. This amount represents 358% of the highest income figure, and an incredible 760% of the lowest, both shockingly violative of Lincoln's guidelines.

This discrepancy between the guidelines and the reality is so great that it creates a question as to whether Janulewicz even read the income figures on the applications. Further, if he read them, did be believe them, and did he rely on them in making his decision whether to approve issuance. Evidence of Defendant's income-to-premium ratio is necessary to show why this information is directly probative to the issues of materiality and reasonable reliance.

**3.    "Alleged violations of nonexistent guidelines"**

Plaintiff does not intend to offer testimony or argument that Lincoln either violated or ignored underwriting guidelines that were not in effect at the time of the underwriting of the Dicesare applications and, as such, this aspect of Defendant's motion is moot.

7

### 4.     "False equation of underwriting with claims review"

Time and again, Defendant has, in its briefs, mischaracterized, misconstrued and misrepresented Plaintiff's contentions to suit Defendant's need for a straw man to knock down. Regardless of Defendant's repeated attempts to suggest as such, Plaintiff does not contend that under ordinary circumstances an insurer has a legal obligation to investigate representations on applications. Nor does Plaintiff argue, as Lincoln erroneously states, that Defendant had no right to conduct a reasonable, even-handed, fair, investigation in good faith once it received a claim for benefits under the Dicesare policies. Further, Plaintiff does not take the position, as Defendant wrongly claims, that the full scope of Lincoln's 6-month claim review should have been conducted at the underwriting stage.

What Plaintiff *does* contend is that evidence in the record demonstrates that Defendant's investigation was designed and conducted in such a manner as to reach the conclusion that benefits would be denied. Had Defendant acted as a prudent insurer, it would have discovered, at the underwriting stage, information more than sufficient to form an accurate understanding of the true state of affairs with regard to Dicesare's finances.

The facts established through discovery show without question that information sufficient to form that level of understanding of Dicesare's finances was easily available to Lincoln's underwriter prior to issuance of the policy, had he done anything to meaningfully resolve the red flags he recognized. Again, Defendant goes to great lengths to twist testimony and take testimony and facts out of context to argue that Plaintiff "admits" that Lincoln could not have discovered enough data during underwriting to have an accurate understanding on Dicesare's finances. It is clear from facts brought out by both sides during discovery that, had Lincoln acted prudently in

underwriting these applications, the truth of Dicesare's finances would have been learned by the company prior to issuance without difficulty.

**5.    "Improper reference to 'post-claims underwriting'"**

Defendant's continual misquotations and misconstruction of Plaintiff's contentions is, at turns, both annoying and disingenuous.  Nowhere has Plaintiff contended, as stated in Defendant's Brief at p.9: "Plaintiff contends that an insurer is <u>inescapably bound</u> to pay on a policy unless it asks every question at the underwriting stage that it might conceivably ask in a subsequent contestability review."  Why Lincoln appears to feel the need to constantly mislead the Court as to Plaintiff's contentions to cover the inadequacy of its defense is a mystery left for another day.

Another mystery is why Defendant persists in citing *Bank of Oklahoma v. Verex*, 1991 WL 283913 (10th Cir. Okla. 1991), a case which the Tenth Circuit made explicitly clear was related to mortgage insurance and had no application in a life insurance context.  The repeated citation of this obviously inapplicable case can only be seen as an attempt to mislead, or at least distract, this Court from the extensive authority supporting Plaintiff's argument.

The evidence in the case is indicative of classic post-claims underwriting - a de minimus underwriting of financial materials prior to issuance (as financial status has little to no relation to mortality and, thus, risk assumption), and a deep, extensive underwriting and investigation of that aspect if and when a claim arises to search for a basis for denial of the claim.  Despite Jordan Carreira's insistence that he would "never, ever" tolerate post-claims underwriting, that is precisely what appears to have happened in this instance.  Defendant's own in-house counsel, Carl Semmler, agreed with Plaintiff that post-claims underwriting constitutes bad faith.  Evidence of and testimony discussing post-claims underwriting is proper and should be permitted in this matter.

**6.     "The existence of a written claims manual is irrelevant"**

In *Flores v. Monumental Life Ins. Co.*, 620 F.3d 1248 (10th Cir. Okla. 2010), cited in Defendant's brief, the Tenth Circuit stated in *Timberlake Construction Co. v. U.S. Fid. & Guar. Co.*, 71 F.3d 335 (10th Cir. 1995), that under Oklahoma law, a showing that material facts were overlooked or that a more thorough investigation would have produced relevant information" would be relevant in a bad faith claim premised on inadequate investigation." *Id.* at 345.  In fact, that citation appears in the very same paragraph as the limited quotation included in Lincoln's brief.

Evidence in this case demonstrates that multiple witnesses, including Lincoln's own appointed agent, had met personally with Joe Dicesare and were of the opinion that he did not have any intent to deceive - an essential element to Defendant's asserted defense of material misrepresentation.  These witnesses have testified that in their opinion, Dicesare actually believed that he was possessed of great wealth, despite all information to the contrary.

These witnesses were never interviewed or even contacted by Lincoln in the course of its 6-month claim investigation.  Despite the fact that proof of intent to deceive is an absolute prerequisite to Defendant's attempted rescission, this fact was never considered during that investigation.  The lack of any written claims manual is probative of a claims practice conducted in a manner which virtually assures that facts will be "cherry picked" so as to result in a denial of benefits.  It is also probative of a corporate desire not to be bound by any written dictates as to a claims investigation should the motive and purpose of that investigation be called into question.

## CONCLUSION

Plaintiff has demonstrated, in each case (aside from one, which is moot), that the evidence Defendant seeks to exclude from trial is relevant and probative, and will assist the jury in its

understanding of the complex issues involved. The information will provide context for the actions of the Defendant's underwriter as well as its claims-related conduct. Nothing in the evidence Lincoln seeks to prevent jurors from learning about is improperly prejudicial or such as would impair either sides' right to a fair trial.

Therefore, Plaintiff prays that Defendant's Motion in Limine Concerning Issues Related to Underwriting and Claims Review be denied.

                                                          Respectfully submitted,
                                                          BONHAM & HOWARD, P.L.L.C.

By:   /s/ Andrew B. Morsman
       Andrew B. Morsman, OBA #10911
       Gene C. Howard, OBA #4395
       15 W. 6th St., Ste. 2066
       Tulsa, OK 74119
       918-744-7440
       918-744-9358 (fax)

       J. Ted Bonham, OBA #946
       Land Mark Towers West
       3555 N.W. 58th St., Ste. 1000
       Oklahoma City, OK 73112
       405-943-6650
       405-943-6655 (fax)

       Clark O. Brewster, OBA #1114
       Guy A. Fortney, OBA #17027
       BREWSTER & DE ANGELIS
       2617 E. 21st Street
       Tulsa, OK 74114
       918-742-2021
       918-742-2197 (fax)

       ATTORNEYS FOR PLAINTIFF

**CERTIFICATE OF SERVICE**

       I hereby certify that on this 9th of November, 2011, I electronically transmitted the foregoing document to the Court Clerk using the ECF System for filing. The Court Clerk will transmit a Notice of Electronic Filing to the following ECF registrants:

Philipp Smaylovsky
Michael Sean Burrage
Clinton Derek Russell
Terry M. Thomas
Christopher B. Woods
Elliot P. Anderson

                                        /s/ Andrew B. Morsman